UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| BRENDA L.[1], | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL NO. 3:21cv859 |
| | ) | |
| KILOLO  KIJAKAZI, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

<u>OPINION AND ORDER</u>

This matter is before the court for judicial review of a final decision of the defendant

Commissioner of Social Security Administration denying Plaintiff's application for Disability

Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. § 423(d), and for

Supplemental Security Income (SSI) under Title XVI of the Act, § 1383(c)(3). Section 405(g) of

the Act provides, inter alia, "[a]s part of his answer, the [Commissioner] shall file a certified

copy of the transcript of the record including the evidence upon which the findings and decision

complained of are based.  The court shall have the power to enter, upon the pleadings and

transcript of the record, a judgment affirming, modifying, or reversing the decision of the

[Commissioner], with or without remanding the case for a rehearing."  It also provides, "[t]he

findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be

conclusive. . . ."  42 U.S.C. §405(g).

The law provides that an applicant for disability benefits must establish an "inability to

engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to last for a continuous period of no less than 12

---

[1] For privacy purposes, Plaintiff's full name will not be used in this Order.

months. . . ."  42 U.S.C. §416(i)(1); 42 U.S.C. §423(d)(1)(A).  A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §423(d)(3).  It is not enough for a plaintiff to establish that an impairment exists.  It must be shown that the impairment is severe enough to preclude the plaintiff from engaging in substantial gainful activity.  *Gotshaw v. Ribicoff*, 307 F.2d 840 (7th Cir. 1962), cert. denied, 372 U.S. 945 (1963); *Garcia v. Califano*, 463 F.Supp. 1098 (N.D.Ill. 1979).  It is well established that the burden of proving entitlement to disability insurance benefits is on the plaintiff.  *See Jeralds v. Richardson*, 445 F.2d 36 (7th Cir. 1971); *Kutchman v. Cohen*, 425 F.2d 20 (7th Cir. 1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record as a whole contains substantial evidence to support the [Commissioner's] findings."  *Garfield v. Schweiker*, 732 F.2d 605, 607 (7th Cir. 1984) citing *Whitney v. Schweiker*, 695 F.2d 784, 786 (7th Cir. 1982); 42 U.S.C. §405(g).  "Substantial evidence is defined as 'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984) quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); *see Allen v. Weinberger*, 552 F.2d 781, 784 (7th Cir. 1977).  "If the record contains such support [it] must [be] affirmed, 42 U.S.C. §405(g), unless there has been an error of law."  *Garfield*, *supra* at 607; *see also Schnoll v. Harris*, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after a hearing, the Administrative Law Judge ("ALJ") made the following findings:

1.      The claimant meets the insured status requirements of the Social Security Act

through June 30, 2017.

2.    The claimant has not engaged in substantial gainful activity since November 27, 2012, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3.    The claimant has the following severe impairments: degenerative disc disease with residuals of spinal fusion surgery; and obesity (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) with the following additional limitations: the option to change position from sitting to standing, and from standing to sitting, approximately every 30 minutes for 2 to 3 minutes, while remaining on task; no climbing of ladders, ropes, or scaffolds; occasional climbing of stairs and ramps, stooping, balancing, kneeling, crouching, and crawling; no exposure to hazards such as unprotected elevations or dangerous moving machinery; no concentrated exposure to vibration; no use of foot or leg controls; no exposure to extremes of temperature or humidity; and no driving as a work duty.

6.    The claimant is capable of performing past relevant work as a customer order clerk. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.    The claimant has not been under a disability, as defined in the Social Security Act, from November 27, 2012, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 20-25).

Based upon these findings, the ALJ determined that Plaintiff was not entitled to benefits,

leading to the present appeal.

Plaintiff filed her opening brief on April 14, 2022. On June 14, 2022 the defendant filed

a memorandum in support of the Commissioner's decision, to which Plaintiff replied on July 12,

2022. Upon full review of the record in this cause, this court is of the view that the

Commissioner's decision should be remanded.

A five step test has been established to determine whether a claimant is disabled. *See*

*Singleton v. Bowen*, 841 F.2d 710, 711 (7th Cir. 1988); *Bowen v. Yuckert*, 107 S.Ct. 2287, 2290-

91 (1987).  The United States Court of Appeals for the Seventh Circuit has summarized that test

as follows:

> The following steps are addressed in order:  (1)  Is the claimant
> presently unemployed?  (2)  Is the claimant's impairment "severe"?
> (3)  Does the impairment meet or exceed one of a list of specific
> impairments?  (4)  Is the claimant unable to perform his or her
> former occupation?  (5)  Is the claimant unable to perform any other
> work within the economy?  An affirmative answer leads either to
> the next step or, on steps 3 and 5, to a finding that the claimant is
> disabled.  A negative answer at any point, other than step 3, stops
> the inquiry and leads to a determination that the claimant is not
> disabled.

*Nelson v. Bowen*, 855 F.2d 503, 504 n.2 (7th Cir. 1988); *Zalewski v. Heckler*, 760 F.2d 160, 162

n.2 (7th Cir. 1985); accord *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984).   In the present

case, Step 4 was the determinative inquiry.

Plaintiff was 45 years old as of her alleged onset date and 50 years old as the date she was

last insured for benefits.  She remained in the age category "closely approaching advanced age"

from December 2016 through the date of the ALJ decision. (Tr. 86). Plaintiff attended school

through the tenth grade and obtained her GED in approximately 1992 (Tr. 42-43). A vocational

witness (VW) who testified at the ALJ hearing classified Plaintiff's past work as a customer order

clerk, a cashier, and a composite job of a cashier and store laborer (Tr. 61-67). The customer

order clerk job was a semi-skilled job and classified as sedentary in exertion according to

4

the Dictionary of Occupational Titles (DOT) but was light in exertion as Plaintiff performed the job (Tr. 61). The cashier job was unskilled and light in exertion according to the DOT but medium as Plaintiff performed the job (Tr. 61-62). The composite job of store laborer/cashier was unskilled and medium in exertion (Tr. 66-67).

In 2006 and November 2012 Plaintiff underwent lumbar spinal fusion surgeries with Jamie Gottlieb, M.D. due the severity of her symptoms and pain (Tr. 351-364). Throughout the relevant period Dr. Grewal diagnosed and treated Plaintiff for post-laminectomy syndrome, lumbar region, lumbosacral spondylosis without myelopathy, and chronic pain syndrome; he prescribed and adjusted multiple medications to treat her pain, including narcotics, opioids, and steroids (Exhibits 3F, 4F, 9F,12F, 13F). Dr. Grewal also performed a sacroiliac injection in September 2013 due to left buttock pain and a caudal epidural steroid injection in May 2015 due to back pain (Tr. 371-372, 391, 394, 397, 407). The record contains treatment evidence with Dr. Grewal dated back to August 2012 when Plaintiff presented to Dr. Grewal regarding lumbar back pain and chronic pain syndrome, and he took over prescribing pain medications for Plaintiff, including Gralise and Methadone (Tr. 467-470). In October 2012 Dr. Grewal added Norco for breakthrough pain, and increased her Gralise dosage (Tr. 465-467). He also referred Plaintiff back to her spinal surgeon, Dr. Gottlieb (Tr. 467). Dr. Gottlieb performed a lumbar "360 fusion" on November 27, 2012 (Tr. 359-366, 466).

Post-operative lumbar spine x-rays in February and May 2013 showed stable post-surgical lumbar interbody fusion of L2 through S1 (Tr. 366-367). In 2013 Plaintiff  presented to Dr. Grewal three times (Tr. 455, 458, 462). In April 2013, she reported falling and had new pain, numbness, tingling and burning between shoulder blades. She also needed to talk about

medication options due to lack of insurance, and Dr. Grewal started Methadone and decreased Oxycodone (Tr. 464). In 2014, Plaintiff had four appointments with Dr. Grewal for chronic pain (Tr. 442,445, 448, 451).

In February 2015 and March 2015, Dr. Grewal reported that Plaintiff wanted Gabapentin prescribed 4 times daily and reported that she "wishes to work on titrating down on her meds" so Oxycodone was decreased (Tr. 436-440). In May 2015 Plaintiff reported increased pain in the bilateral hips, and Dr. Grewal added Diclofenac (Tr. 431-433). In July 2015 Plaintiff reported that she recently fell and was having increased pain in the left buttock; she completed a Medrol Dosepak with minor relief, and Dr. Grewal suggested adding Diclofenac and possible physical therapy or new imaging if she did not improve (Tr. 428-430). Plaintiff presented to Dr. Grewal for chronic pain in September 2015 (Tr. 425). Plaintiff again presented to Dr. Grewal in November 2015 with complaints of leg pain, back pain, and hip pain causing interference with sleep. She reported that Dr. Gottlieb wanted to do surgery, but she did not have insurance at the time; he was looking into doing a spinal cord stimulator trial if he could get the system donated to her (Tr. 422-424).

Plaintiff continued to attend appointments with Dr. Grewal for treatment of her chronic pain syndrome in January 2016, March 2016, May 2016, and July 2016 reporting bilateral leg pain, back pain, hip, and buttocks pain and sleep problems; her pain levels ranged from a 6/10 to 10/10 (Tr. 410-419). In September 2016, Plaintiff continued to have bilateral leg pain, back pain, and hip and buttocks pain (Tr. 407). Dr. Grewal prescribed a Medrol Dosepak and increased Gabapentin (Tr. 410). Plaintiff returned to Dr. Grewal in November 2016 with ongoing leg pain, back pain, hip pain, and buttocks pain, and to follow-up with medication management (Tr. 404).

She described her pain as cramping, sharp, dull; she reported that the back of the knee hurts after being bent for a period. Her current pain level was at a 6/10 and her worst pain at a 10/10 (Tr. 406). Dr. Grewal increased Gabapentin and advised trying Diclofenac again to help with her pain (Tr. 407).

Plaintiff saw Dr. Grewal six times in 2017 (Tr. 386-404). She continued to describe a cramping, sharp and dull pain with current pain levels ranging from 7/10 to 8/10, and the worst pain at a 10/10. She reported that her pain interfered with her sleep (Tr. 392, 395, 398, 401, 404).

Plaintiff presented to Dr. Grewal five times in 2018 with pain ranging from 7/10 to 10/10 (Tr. 533-547). In June 2018, Dr. Grewal noted Plaintiff was unhappy about titrating down her opiates but she has no insurance and the options were limited (Tr. 542). In October 2018, Dr. Grewal noted "Patient is having increased pain in the back into both legs. We discussed options including PT and injections, she will think about it. Without [insurance] cost is an issue. She restarted Gabapentin 1 week ago so hopefully this will help" (Tr. 536).

In 2019, Plaintiff presented to Dr. Grewal six times, rating her pain level from 7/10 to 10/10 and reporting that her pain causes inference with sleep (Tr. 522-532, 572-574, 606-608). In March 2019, Plaintiff reported her current pain level as a 10/10 and Dr. Grewal noted that Plaintiff was requesting an increase in opiates, and the request was declined (Tr. 530). In May 2019, Dr. Grewal noted every other month exchanges where Plaintiff requested more opiates which he declined since being on high dose opiates long term was not good (Tr. 527).

In 2020, Plaintiff presented to Dr. Grewal six times rating her pain level from 6/10 to 10/10, reporting pain was interfering with sleep (Tr. 600-630). In March 2020, Dr. Grewal noted again noted that Plaintiff was continuing to request more opiates which was declined (Tr. 602). In

May 2020, Dr. Grewal noted Plaintiff was having new pains and spasms in the back and down

left leg for the past month a half; he prescribed a Medrol Dosepak and noted she was going to

start taking CBD oil (Tr. 630). At a January 2021 appointment Plaintiff reported a current pain

level of 7/10 causing interference with sleep, and there was discussion about working together in

the future to try to reduce opioid load, and if not successful, to just maintain current level (Tr.

613-616).

Plaintiff also saw primary care physician Frank Murphy, M.D. at a new patient

appointment in May 2016 and reported her biggest health issue was chronic pain related to her

previous back surgeries; she lacked health insurance and had not followed up on other health and

preventative care issues (Tr. 514). She had a lot of stress, difficulty sleeping, labile moods, and

mild fatigue along with severe hot flashes (Tr. 514). Dr. Murphy noted she was disabled due to

back pain, and his physical exam documented a vertical incision over the lumbar back with

diffuse tenderness to palpation; she walked slow and guarded, had limited mobility in the lumbar

spine, and had some "generalized density of her legs" (Tr. 516). Dr. Murphy prescribed Sertraline

to see if it would help with hot flashes (Tr. 516). He recommended continuing to see her pain

specialist for her pain medications and provided a prescription for Chantix for smoking cessation

(Tr. 516-517). Dr. Murphy also diagnosed obesity with a BMI of 37 and encouraged weight loss

but also noted she was "quite limited in regard to this because her inability to exercise related to

her debilitating back pain" (Tr. 517). In June 2019 Plaintiff returned to Dr. Murphy due to

elevated blood pressure which had been running in the 160s to 170s; she remained without health

insurance and wondered what could be done (Tr. 511-513). Dr. Murphy diagnosed hypertension

and prescribed Amlodipine (Tr. 513).

In December 2019 Plaintiff underwent a consultative examination with Ralph Inabnit, M.D. at the request of the Indiana DDB (Tr. 587-593). Dr. Inabnit noted her history of lumbar fusion surgeries in 2006 and 2012, and her history of chronic back pain (Tr. 587). She rated her current pain as 7/10 and noted she avoids flexing, bending, pushing, pulling, or repetitive motion (Tr. 587). Her back pain was worse with sitting and improved with lying down, and she had intermittent bouts of radiculopathy involving the left leg to the toes of the left foot (Tr. 587). Exam findings were mostly normal except for limited range of motion of the lumbar spine (Tr. 590-593).

As part of the application development process, Plaintiff completed a "Function Report" in August 2019 (Tr. 285-92). Plaintiff reported she lives in a house with her boyfriend and grandson (Tr. 285). On a typical day she wakes her grandson for school, does some light housework dependent on her pain level and mobility, watches television, makes dinner, again dependent on her pain and mobility, watches television again, and then goes to bed (Tr. 285). Her boyfriend helped with her grandson, including cooking for him when Plaintiff was unable; her boyfriend also played with her grandson outside because Plaintiff was unable to do so (Tr. 286). Her chores included doing the dishes and preparing food with breaks (Tr. 287). She did laundry with help and light cleaning (Tr. 287). Her boyfriend and grandson did the yardwork (Tr. 288). She went outside about once a month, including going to her doctor's appointments about once a month which lasted about 5 minutes and included "exchang[ing] pleasantries", getting her prescriptions, and leaving (Tr. 288-289). She did not shop often, and when she did shop, she only got a few items that she could get quickly—20 minutes maximum (Tr. 288). Her sleep was interrupted from pain, and she needed to change positions (Tr. 286). She could only shower, not

9

bathe; she needed to sit to do her hair; she sometimes required help with dressing and shaving (Tr. 286). Her hobbies and interests included watching TV and the internet; she used to often play bingo but could no longer do that because she was no longer able to sit that long (Tr. 289-290, 290, 302). Her conditions affected many abilities including lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, and stair climbing (Tr. 290). She could pay attention and handle stress unless she had extreme pain which was often (Tr. 290). Plaintiff's daughter also completed a function report in January 2020 (Tr. 297-304). Her daughter wrote that Plaintiff's ability to prepare meals was limited; she was unable to lift much weight; and she mostly sat in her room or the living room (Tr. 299, 302, 304).

At the supplemental phone hearing on April 14, 2021, Plaintiff testified by phone as did a vocational expert ("VE"), Michael Stern (Tr. 35-85). Plaintiff testified that since November 2012 "really bad pain" in her back and down through her legs had kept her from being able to work and limited her ability to sit, stand, walk, lift, and bend (Tr. 44-46). She stopped working as of November 27, 2012, when she underwent a second spinal fusion surgery; she returned to work at Flexible Foam Products in 2013 in customer service after her surgery recovery period, but she worked only for about a week because she was "just not able to do it" (Tr. 43-44, 48-49 57-58, 61).

Plaintiff testified regarding her medical treatment history which included a back fusion surgery in 2006 on the lower part of her spine; the 2012 surgery was a "360 fusion" on the four vertebrae above the ones fused in 2006 (Tr. 48-49). The 2012 surgery was not helpful nor was the physical therapy that followed (Tr. 49). Her surgeon indicated he could fuse the last part of her spine, but there was no guarantee it would be helpful, and Plaintiff was without insurance (Tr.

51). Her spine surgeon, Dr. Gottlieb, referred her to a pain management doctor, Dr. Grewal, who she continued to see (Tr. 50). Her doctor had "put in for" spinal cord stimulator to be donated, and Plaintiff last heard that was not possible (Tr. 51-52). Plaintiff took pain medications and had been on Methadone since 2012 (Tr. 47-48). She had been taking Percocet for a couple of years and Gabapentin for about a year; Mobic and Cymbalta were also recently added (Tr. 48). She also took medication for high blood pressure and saw Dr. Frank Murphy, a primary care doctor (Tr. 47, 52).

Regarding her abilities, Plaintiff estimated she could sit for about five to ten minutes before she needed to change positions; she could stand ten minutes at a time before needing to get off her feet; and she could walk for seven minutes (Tr. 44). She thought she could lift about five pounds or a gallon of milk (Tr. 45). Reaching and lifting with her arms pulled her back (Tr. 45). She also had difficulty with pushing, pulling, turning, and bending (Tr. 55-56). Her medications caused a little bit of sleepiness, and she had difficulty concentrating due to the amount of pain she experiences (Tr. 49-50). Sometimes she was unable to watch a half hour television show (Tr. 55). Weather, as well as sitting and standing in one position too long, caused more pain or stiffness (Tr. 53-54). Plaintiff did some household chores but was limited due to her inability to stand for long (Tr. 45). She could dress and bathe, but her grandson tied her shoes when she experienced a flare-up (Tr. 46). Pain flares could last three to four hours (Tr. 54). She did not drive often because she could not go for long without having to readjust her positioning (Tr. 46).

In support of remand, Plaintiff argues that the ALJ erred in her evaluation of Plaintiff's chronic pain syndrome. The ALJ concluded that Plaintiff's only severe impairments were degenerative disc disease with residuals of spinal fusion surgery and obesity (Tr. 20). The ALJ

11

failed to mention or evaluate Dr. Grewal's opinion that Plaintiff suffered from a medically determinable chronic pain syndrome impairment. Plaintiff contends this diagnosis is highly pertinent evidence because it impacts the consideration of Plaintiff's symptom reports and implicates disabling limitations the ALJ omitted from the RFC.

Despite a generally deferential standard of judicial review of agency decisions, an administrative decision that "fails to mention highly pertinent evidence" cannot be upheld. *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010) (citing *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009)); *see also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight"). Plaintiff points out that the ALJ's error was not harmless because as a result, the ALJ did not adequately consider limitations for Plaintiff's chronic pain syndrome in the RFC.

Plaintiff also asserts that the ALJ failed to consider the effect that Plaintiff's pain and years of use of very heavy pain medication prescribed by Dr. Grewal may have had on her mental functioning. Although Plaintiff wrote in her function report that she could handle stress "average" and pay attention as long as she needed, she immediately added a qualification indicating her ability to handle stress and pay attention were limited when her pain was extreme which was "often" (Tr. 290-291). Plaintiff testified at the ALJ hearing that she had difficulty concentrating due to the amount of pain she experiences; sometimes she was unable to concentrate to watch a 30-minute show or even a conversation due to her intense pain because all she could think about was the pain and making it go away (Tr. 49-50, 55).

The record also contains evidence supporting a medically determinable depressive disorder; however, the ALJ concluded the "records do not contain abnormal mental status

12

findings supporting a medically determinable mental impairment" (Tr. 21). Plaintiff correctly argues that the ALJ erred in failing to acknowledge or evaluate the contrary evidence supporting the presence of a depressive disorder and concentration, persistence, and pace limitations. *See Reinaas v. Saul*, 953 F.3d 461, 467 (7th Cir. 2020). The medical evidence indicates that Plaintiff has a history of depression and has taken medications for anxiety and depression (Tr. 433, 443, 454, 458). May 2016 office notes from Dr. Murphy indicate Plaintiff had a high level of stress, labile moods, and difficulty sleeping at times (Tr. 514). PHQ-9 scores also document moderate to severe depression. In July 2014, the record indicates Plaintiff scored 18 on the PHQ-9 which indicates depression in the moderately severe range (Tr. 454). She indicated that she felt tired or had little energy; she had difficulty concentrating on things, such as watching television or reading the newspaper; and she had difficulty falling asleep or sleeping too much (Tr. 454). When the PHQ-9 test was repeated in January of 2017, her score was a 22 which reflects depression in the severe range (Tr. 403). The record documents that Plaintiff was prescribed Lexapro and she reported taking it for anxiety (Tr. 273, 294, 512, 588). She has also taken Sertraline (Tr. 512, 516-517). The record further reveals prescription of two anti-anxiety medications including Alprazolam and Clonazepam (Tr. 383, 391 479, 512, 588). The ALJ did not address the history of a diagnosis of a depressive disorder or the PHQ-9 scores. The ALJ should have developed the record regarding Plaintiff's mental impairments and further evaluated her concentration, persistence, and pace restrictions, particularly considering her long-standing diagnosis of a chronic pain disorder, the strong prescription pain medications she had taken for years, the prescription of anti-depressant and anti-anxiety medications, and evidence of more than minimal limitations with concentration, persistence, or pace confirmed in the record. *Murphy v. Astrue*,

496 F.3d 630, 634 (7th Cir. 2007)(stating an ALJ has a duty to develop the record before drawing

any conclusions, citing 20 C.F.R. § 416.912(d)). The ALJ also found that obesity is a severe

medically determinable impairment; the Agency itself recognizes that obesity is often associated

with musculoskeletal impairments and increases the risk of developing mental impairments,

including depression. SSR 19-2p.

Even if Plaintiff did not have a severe medically determinable mental impairment, SSA

recognizes that pain may affect an individual's ability to meet non-exertional demands of work

including, *e.g.*, concentration. *See* Program Operations Manual System (POMS) DI 24510.006. In

this case, the failure to account for any concentration, persistence, and pace deficits in the RFC

and the need for breaks due to chronic pain disorder and the combination of Plaintiff's

impairments was an error. When determining an individual's RFC, the ALJ must consider the

combined effects of all limitations that arise from medically determinable impairments based on

the record as a whole, even those that would not be considered severe in isolation. *Thomas v.*

*Colvin*, 745 F.3d 802, 807 (7th Cir. 2014) (7th Cir. 204); *Getch v. Astrue*, F.3d 473, 483 (7th Cir.

2007) 20 C.F.R. §§ 404.1523 and 416.923. SSR 19-2p also instructs adjudicators to consider all

work-related physical and mental limitations, whether due to a person's obesity, other

impairment(s), or combination of impairments. Here, the evidence and symptom reports confirm

Plaintiff's pain disrupted her ability to sustain activities, necessitated strong opioid medications,

and required her to take breaks, including lying down to relieve her pain.

The Commissioner acknowledges that the ALJ failed to mention Plaintiff's chronic pain

disorder.  However, the Commissioner argues that Plaintiff failed to show that her chronic pain

significantly limited her ability to perform work activities. It is clear that the ALJ did not consider

14

whether Plaintiff's chronic pain limited her ability to work, as the ALJ did not discuss Plaintiff's chronic pain at all. It is also clear that Plaintiff presented evidence of extensive pain management treatment to support her argument that she suffered from chronic pain.

The Commissioner also argues that the ALJ's failure to evaluate Plaintiff's chronic pain at Step Two of the sequential evaluation was irrelevant. However, the ALJ also failed to evaluate the evidence of Plaintiff's chronic pain at the other stages of the sequential evaluation.  Thus, remand is required for a proper evaluation of Plaintiff's chronic pain disorder, as well as her depression.

Plaintiff also argues that the ALJ erred in her evaluation of Plaintiff's subjective symptoms and failed to consider the combined impact of her impairments. An ALJ must assess the claimant's subjective symptoms rather than assessing "credibility." SSR 16-3p. Under SSR 16-3p, the ALJ first must determine whether the claimant has a medically determinable impairment that reasonably could be expected to produce her symptoms. SSR 16-3p. Then, the ALJ must evaluate the "intensity, persistence, and functionally limiting effects of the individual's symptoms to determine the extent to which the symptoms affect the individual's ability to do basic work activities." SSR 16-3p. An individual's statements about the intensity and persistence of the pain and other symptoms may not be disregarded simply because they are not substantiated by objective medical evidence. SSR 16-3p. In determining the ability of the claimant to perform work-related activities, the ALJ must consider the entire case record, and the decision must contain specific reasons for the finding. SSR 16-3p. The ALJ must weigh the claimant's subjective complaints, the relevant objective medical evidence, and any other evidence of the following factors: (i) the individual's daily activities; (ii) location, duration, frequency, and

15

intensity of pain or other symptoms; (iii) precipitating and aggravating factors; (iv) type, dosage,

effectiveness, and side effects of any medication; (v) treatment, other than medication, for relief

of pain or other symptoms; (vi) other measures taken to relieve pain or other symptoms; (vii)

other factors concerning functional limitations due to pain or other symptoms. *See* 20 C.F.R. §

404.1529(c)(3).

      In considering the subjective symptoms, the ALJ indicated: "After careful consideration of

the evidence, the undersigned finds that the claimant's medically determinable impairments could

reasonably be expected to cause the alleged symptoms; however, the claimant's statements

concerning the intensity, persistence and limiting effects of these symptoms are fully supported

for the reasons explained in this decision" (Tr. 23). The ALJ acknowledged Plaintiff's

impairments could "reasonably be expected to produce [her] symptoms" but claimed her

"allegations" were not "fully supported by the objective medical evidence of record" (Tr. 23). The

ALJ's statement and presumption that symptoms need to be "fully supported" is inconsistent with

the governing regulations. Social Security regulations require an to evaluate a claimant's

symptoms and determine "the extent to which [] symptoms can reasonably be accepted as

consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(a).

Aside from citing a legally incorrect "wholly" consistent standard, the ALJ also engaged in an

impermissible sound-bite approach in discussing the pain management treatment course and

critically failed to even discuss or acknowledge Plaintiff's "chronic pain syndrome" diagnosis at

step two or elsewhere in the decision.

      The ALJ cited the following evidence as undermining the symptom reports: (1) medical

findings of "normal motor bulk"; (2) reports of "NAD" (no acute distress); (3) some reports of no

gait problems, sensory deficits or motor deficits; (4) imaging showing severe stenosis with postsurgical changes but no canal stenosis or cord impingement; (5) reports of "doing well" or "stable" on medications and a desire to titrate down on medications; and (6) conservative treatment since 2012 (Tr. 23). The ALJ failed to explain which symptoms she found consistent or inconsistent with the evidence or why the evidence implied Plaintiff was not as limited as she reported. The ALJ cited the pain management record of Dr. Grewal from August 2012 and February 2014 showing no "NAD" (no acute distress) under the "constitutional" exam and "normal bulk" on the neurological exam (Tr. 454-454, 469). But the ALJ did not explain how these exam findings undermined Plaintiff's symptom reports, including her chronic pain, given the entirety of the exams and record as a whole. One of the exams showing "normal bulk" and NAD occurred in August 2012, yet current pain was rated as a 7/10, and Dr. Grewal agreed to take over prescribing medications and prescribed Methadone 10 mg every eight hours and Gralise 600 mg, extended release, awaiting insurance to start; he also recommended considering a spinal cord stimulator (SCS) (Tr. 468-469). At Plaintiff's next appointment with Dr. Grewal in October 2012, he added Norco 10 mg for breakthrough pain, titrated up Gralise, and referred Plaintiff back to Dr. Gottlieb for a surgical evaluation; she ultimately underwent extensive lumbar fusion surgery with Dr. Gottlieb on November 27, 2012, which coincides with her reported disability onset date (Tr. 271, 357-364, 467). Dr. Grewal again recorded "normal bulk" and "NAD" in February 2014 (Tr. 453-454). Yet, at that exam, Plaintiff reported a low back pain radiating in the lower extremities with bilateral hip and buttock pain with current pain rated as 8/10 and interfering with sleep (Tr. 453). Although Dr. Grewal also noted at that appointment that Plaintiff was "doing well" on her current medications, he also noted Methadone was increased to "TID,"

and he also prescribed Oxycodone 30mg every 6 hours and a Medrol Pak for chronic pain (Tr. 455). At the same appointment Plaintiff rated her pain relief as 60% lasting for 3 hours (Tr. 453). Without an explanation of what Dr. Grewal meant by no acute distress, it cannot be assumed that Plaintiff was pain-free.  "No acute distress" generally means that the patient is conscious, not bleeding profusely, not struggling for breath, and other things of that nature indicating that the patient is not in need of immediate emergency care. The ongoing and extensive pain management treatment provided by Dr. Grewal and his records during the relevant period, as discussed above, confirms the severity of Plaintiff's chronic pain.

Similarly, the ALJ did not explain how some exams demonstrating normal gait and lack of sensory or motor deficits undermined Plaintiff's symptom reports regarding her pain (Tr. 23). Plaintiff did not allege she was unable to walk or even that she needed an assistive device. Instead, she reported increasing pain with maintaining positions such as prolonged standing, walking and even sitting. This is corroborated by Dr. Grewal's records as discussed above. The record is clear that Plaintiff's fluctuating pain levels, other factors such as her activity level, the weather, and the effectiveness of her medications, impacted her ability to function. A person who has a chronic impairment, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days. *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008).

The ALJ also cited a lumbar spine imaging presumably as inconsistent with Plaintiff's symptom report, yet again there is no connection between the findings and the ALJ's medical speculation (Tr. 23). The ALJ identified a lumbar MRI from April 2011 (Tr. 549-550) which was prior to the alleged onset date. That MRI report indicated there was no evidence of "critical

18

central canal stenosis" and indicated a further study was needed to evaluate the potential effect on the nerve roots if symptoms continued (Tr. 550). Later lumbar spine imaging was completed in 2013 to evaluate the post-fusion surgery; however, the imaging appears to be lumbar flexion and extension x-rays to evaluate the stability of the fusion and hardware (Tr. 366-367). Lumbar spine x-rays were also completed as part of the consultative exam for SSA and demonstrated "severe" spondylosis at L1-L2 with post-surgical changes including extensive hardware and radiopaque debris in the right hemipelvis measuring 1.1 cm (Tr. 594). The ALJ has failed to explain how lumbar spine imaging failed to corroborate Plaintiff's symptom report about her chronic pain, particularly given the many abnormal, severe findings demonstrated.

The ALJ implied that Plaintiff's conservative treatment since 2012 undermined her symptom reports. Although infrequent treatment or failure to follow a treatment plan can support an adverse finding regarding the severity of an individual's subjective symptom complaints, Plaintiff's treatment can hardly be characterized as infrequent or conservative. *See* SSR 16-3p. In this case, the ALJ improperly characterized Plaintiff's treatment as "conservative," and she failed to explain why the surgical history leading up to 2012 did not factor into her evaluation. The ALJ did not logically explain why a history of two extensive lumbar spine surgeries, undergoing physical therapy and epidural steroid injections, and continuing to take powerful prescription opiate and narcotic pain medications, which were often adjusted by her pain management physician, Dr. Grewal, was a course of conservative treatment. Dr. Grewal also prescribed steroids, a Medrol Pak, in addition to multiple pain medications at times. Yet the decision does not even identify the powerful medications, including opioid medications to treat long-term severe pain, that Plaintiff has taken to relieve her pain, including Methadone, Gralise

(Gabapentin), Hydrocodone, Oxycodone, Medrol, and Diclofenac.

The ALJ also claimed that Plaintiff was "doing well" or "stable" on medications and one notation from 2015 about Plaintiff's desire to work on titrating down her medication presumably undermined the symptom reports (Tr. 23). In this regard, the ALJ has taken an impermissible sound-bite approach to reviewing the evidence. *See Scrogham v. Colvin*, 765 F.3d 685, 698 (7th Cir. 2014). (A "sound-bite" approach to record evaluation where the ALJ is inappropriately selective in choosing the evidence on which she based her opinion is an impermissible methodology for evaluating evidence). Dr. Grewal's office visit note from March 2015 indicates Plaintiff wanted to work on titrating down her medication so Oxycodone was decreased to 15 mg (Tr. 437). His notes from the same visit indicate Plaintiff also wanted to increase her Gabapentin 300 mg to 4 times daily from 3 times daily (Tr. 436). The ALJ neglected to note at the next visit in May 2015, Plaintiff had reported increased pain in the bilateral hips, so Dr. Grewal added Diclofenac, and in July 2015 he prescribed a Medrol Dosepak due to worsening pain after Plaintiff fell (Tr. 438-433). In November 2015 she reported Dr. Gottlieb wanted to do surgery, but she did not have insurance at the time; he was looking into doing a spinal cord stimulator trial if he could get the system donated to her (Tr. 422-424).  Dr. Grewal's records throughout the relevant period, as discussed above, demonstrate ongoing severe pain, addition of medications, adjustment of dosages, and limited treatment options due to lack of insurance. (Tr. 536, 542).

Contrary to the ALJ's characterization, Plaintiff's course of treatment strongly supports and does not detract from her symptom reports regarding the severity of her pain. *See Lambert v. Berryhill*, 896 F.3d 768, 778 (7th Cir. 2018) (citing *Israel v. Colvin*, 840 F.3d 432, 441 (7th Cir. 2016)) (that a claimant has undergone painful and risky procedures in attempts to alleviate pain

would seem to support the credibility of claims regarding the severity of pain); *Plessinger v. Berryhill*, 900 F.3d 909, 916 (7th Cir. 2018) (citing *e.g., Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004)) (finding doctor's prescription for strong pain medications corroborated claimant's credibility regarding pain).

The ALJ also appears to have afforded inappropriate weight to what she perceived absence of "objective" evidence in the record. She also made unsupported assumptions about the meaning of the absence of such findings. *See* HALLEX I-2-5-69 ("An ALJ cannot make a credibility finding based on intangible assumptions or intuition."). As discussed above, the ALJ also failed to explain how the selected recitation of the medical evidence undermined Plaintiff's reports about her symptoms, including her reports concerning her pain. "Symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone." 20 C.F.R. § 404.1529(c)(3)("Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions which you . . . report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account."); *see also* 20 C.F.R. § 404.1529(c)(4) ("Your symptoms . . . will be determined to diminish your capacity for basic work activities to the extent [they] can reasonably be accepted as consistent with the . . . evidence.").

In this case, the ALJ failed to address many of the factors in the regulation and ruling for evaluating the intensity and persistence of Plaintiff's pain reports including her daily activities, the location, duration, frequency, and intensity of pain or other symptoms, precipitating and aggravating factors, type, dosage, effectiveness, and side effects of any medication, treatment, other than medication, for relief of pain or other symptoms, and other measures taken to relieve

pain or other symptoms. *See* 20 C.F.R. § 404.1529(c)(3); SSR 16-3p. As discussed above, Plaintiff's daily activities are limited and performed with frequent breaks, position changes, and periods of rest and lying down. She has undergone two extensive lumbar spine surgeries to improve her symptoms and pain yet remains reliant on strong prescription pain medications which are partially and temporarily effective and also cause drowsiness. The ALJ failed to explain why she did not find Plaintiff's need for strong pain medication supportive of her subjective complaints. *See, e.g., Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004)(claimant unlikely to successfully fool physicians into prescribing powerful medications only to bolster claimant's application for Disability Insurance Benefits).

The ALJ merely recited portions of Plaintiff's reports about factors aggravating and alleviating her pain, but she failed to explain what she believed or disbelieved about symptom reports along with logical reasons (Tr. 23). In addition to testifying about the factors aggravating and relieving her pain, Plaintiff also consistently reported these factors to Dr. Grewal. His pain management notes repeatedly indicate that Plaintiff's knee hurt after being bent for a period and that carrying, twisting, lifting, long term activity/positioning, and bending were factors aggravating her pain; factors alleviating her pain included medication, position change, rest, and lying down (Tr. 383, 390, 393, 395, 398, 401, 404, 406, 409, 412, 415, 418, 421, 424, 427, 430, 433, 436, 439, 444, 447, 450, 453, 458, 460, 464, 466, 469,523, 527, 530, 533, 536, 538, 541, 544, 547, 574, 602, 605, 608, 615, 619, 622, 626, 630)).

The ALJ also erred in failing to evaluate the observation from SSA's own field office employee and the opinion from the Indiana DDB examiners which support Plaintiff's symptom reports about her pain. During Plaintiff's hour-long interview with the field office in August

2019, the SSA worker, C. Johnson, observed Plaintiff had difficulty sitting and seemed slightly uncomfortable when sitting down because she moved and readjusted herself a few times and had difficulty rising from her chair after the 1-hour interview; this is consistent with Plaintiff's reports about her difficulty and increased pain sitting for more than five to ten minutes and need to changes positions (Tr. 281). An ALJ is required to consider the observations of agency personnel such as SSA field office employees. SSR 16-3p ("We will consider any statements in the record noted by agency personnel who previously interviewed the individual, whether in person or by telephone."). Even the state agency evaluators concluded that Plaintiff's symptoms included pain, that her medically determinable impairments could "reasonably be expected to produce [her] pain or other symptoms" and that "[her] statements about the intensity, persistence, and functionally limiting effect of the symptoms [was] substantiated by the objective medical evidence alone" (Tr. 94, 105, 118, 130). The failure to consider the state agency evaluator's opinions supporting Plaintiff's symptoms and pain is an error of law and violates SSR 16-3p.

The ALJ also summarily dismissed Dr. Murphy's notation that Plaintiff was disabled due to her back pain citing it as an opinion "reserved to the Commissioner of Social Security" that did not require analysis (Tr. 24, 515). While the SSA's revised regulation for evaluating medical opinion evidence under 20 C.F.R. §§ 404.1520b and 416.920c purports to absolve the ALJ from providing articulation about such statements, SSR 16-3p still requires an ALJ to consider statements like Dr. Murphy's when considering a claimant's subjective symptom reports. Dr. Murphy also noted Plaintiff was "quite limited in regard [to weight loss] because her inability to exercise related to her debilitating back pain," but the ALJ did not mention this statement (Tr. 515, 517). Here, Dr. Murphy was persuaded that Plaintiff's back pain was disabling and

23

debilitating, and his statements are important under SSR 16-3p in evaluating Plaintiff's subjective symptoms. *See* SSR 16-3p ("Medical sources may offer diagnoses, prognoses, and opinions as well as statements and medical reports about an individual's history, treatment, responses to treatment, prior work record, efforts to work, daily activities, and other information concerning the intensity, persistence, and limiting effects of an individual's symptoms.").

As there are many errors in the ALJ's analysis of Plaintiff's subjective symptoms, detailed above, remand is warranted on these points.

Plaintiff next argues that the ALJ failed to include all of her limitations in the RFC and the hypothetical to the VE.  The RFC is an assessment of what work-related activities a claimant can perform despite her limitations. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004); *see also* 20 C.F.R. § 404.1545(a)(1). In evaluating a claimant's RFC, an ALJ is expected to take into consideration all the relevant evidence, including both medical and non-medical evidence and must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.*, 8 hours a day, for 5 days a week, or an equivalent work schedule). *See* 20 C.F.R.§ 404.1545(a)(3); SSR 96-8p. As noted above, the ALJ failed to properly analyze Plaintiff's impairments in combination, including her chronic pain disorder and erred in evaluating her symptom reports which also left unsupported the assessment of her RFC. The ALJ did not explain how she accounted for Plaintiff's limited ability to sit for prolonged periods, her need to lie down to relieve pain, and disruption of concentration due to pain.

The record documents that Plaintiff's chronic pain limits her ability to sit for prolonged periods of time. *See Liggins v. Colvin*, 593 F. App'x 564 (7th Cir. 2015) (ALJ failed to properly consider sitting limitation in obese claimant with back difficulties). Although the ALJ provided

24

an option to change positions from sitting to standing approximately every 30 minutes for 2 to 3 minutes while remaining on task, the ALJ failed to explain how she arrived at this limitation (Tr. 22). There is no evidence or medical opinion that supports the ALJ's RFC conclusion that Plaintiff could complete a full 8-hour workday, five days a week, sitting down if she has the ability to stand for 4 to 6 minutes out of hour. The ALJ also presumed without any supporting opinion or evidence that Plaintiff could remain on task for those 4 to 6 minutes each hour.

In this case, the ALJ agreed the opinions of the state agency physicians were "unpersuasive," and she did not rely on them (Tr. 24). Although the ALJ is not required to adopt a specific physician opinion, by not adopting any medical opinion, the ALJ faced an evidentiary deficit. *Suide v. Astrue*, 371 F. App'x 684, 689-90 (7th Cir. 2010) (lack of reliance on any physician opinion evidence created an evidentiary deficit).

Among the functional restrictions that an ALJ must consider are those that stem from a claimant's need to lie down during the day. *Myles*, 582 F.3d at 677; *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013) (remanding because "no employer is likely to hire a person who must stop working and lie down"). The severity of Plaintiff's ongoing pain and along with her strong medication she takes strongly support a finding that she would not retain the ability sustain a RFC for full-time work at any exertional level. *See* POMS DI 24510.057.  Thus, remand is warranted for a proper assessment of Plaintiff's RFC, and also so that the ALJ can properly consider Plaintiff's impairments in combination.

25

<u>Conclusion</u>

On the basis of the foregoing, the Decision of the Commissioner is hereby REVERSED

AND REMANDED for further proceedings consistent with this Opinion.


 Entered: July 15, 2022.


<u>s/ William C.  Lee</u>
William C. Lee, Judge
United States District Court